## WHITFIELD *v.* UNITED STATES.

A. sold cotton to the Confederate States, accepted their bonds in payment therefor, but remained in possession of it until its seizure by the agents of the United States, who sold it, and paid the proceeds into the treasury. *Held,* that A. cannot recover such proceeds in an action against the United States.

APPEAL from the Court of Claims.

During the war of the rebellion, Whitfield, a resident of the State of Alabama, being the owner of a hundred and seventy-seven bales of cotton raised by himself, sold it to the Confederate States, agreeing to receive in payment their eight per cent bonds.   In January, 1865, payment of the purchase-price was made and accepted in bonds of the kind agreed upon, payable to bearer, and falling due in the years 1868, 1871, and 1880. Whitfield kept the bonds in his possession, and, at the trial of this case below, produced them in open court.   The cotton was never taken away by the Confederate States authorities, but remained in his possession until Sept. 1, 1865, when it was

seized by the treasury agents of the United States, acting under color of the authority of the abandoned and captured property acts. After the seizure, fifty-nine bales were, pursuant to an arrangement, restored to him, as compensation for putting the cotton in good order, and the remaining one hundred and eighteen bales sent forward to New York, where they were sold by the cotton agent of the United States, and the proceeds paid into the treasury. This suit was brought to recover these proceeds.

In the Court of Claims, the petition was dismissed: whereupon Whitfield appealed to this court.

*Mr. P. Phillips* for the appellant.

There was no legal authority for the seizure of the cotton. It did not come within the definition of captured property as recognized in *United States* v. *Padelford*, 9 Wall. 537.

The Court of Claims, in *Sprott* v. *United States*, 8 Ct. of Cl. 499, decided that the government of the Confederate States was an unlawful assemblage, without power to take, hold, or convey real or personal property. If such be the law, the sale in question did not divest the title of the claimant.

Conceding, however, that they could enter into a contract of purchase recognizable in our courts, the question is then presented, whether property so purchased, the possession of which was never parted with by the owner, can be taken from him by the United States after the overthrow and dissolution of that government, he being then the holder of the securities given as the consideration of the purchase.

Let it be supposed that Whitfield had sold this cotton to A., and had received his bond for the purchase-money, but had never parted with the possession. A. becomes insolvent; but his property had been forfeited to the United States. Surely, under these circumstances, the government, asserting its claim through A., could never rightfully demand the cotton without paying the purchase-money.

There is no difference between this supposititious case and that now before the court, as the contract, under the same circumstances, was made with the Confederate government.

When a government enters into a contract of purchase or other mercantile operation, it puts off its sovereignty; and, in

such transactions, its rights and obligations are regarded by the court as standing on no higher ground than like transactions between individuals.    2 Story, Com., § 1330; *United States* v. *Buford*, 3 Pet. 12; *Davis* v. *Gray*, 16 Wall. 232.

Conceding the right of the government to exercise all powers necessary to carry on the war to a successful termination, we maintain that war does not operate *proprio vigore* a confiscation of the enemy's property.

It is for the legislative body to determine the *policy* on which the war shall be conducted.

Congress determined the question how far belligerent rights should be exercised.

The act 13th July, 1861, provides for the seizure of ships or vessels belonging to citizens of States engaged in insurrection, found at sea.

By the act 6th August, 1861, property sold or given, with intent to use or employ the same for the purpose of promoting the insurrection, is made subject to prize or capture.

By the act 17th July, 1862, the property of persons designated by six enumerated classes is, in a certain contingency, subject to confiscation.

In neither of these acts is the title of the owner divested by the seizure.    This takes place only when judicial proceedings are instituted, and a judgment of condemnation is had.    Then the property is sold, and the proceeds paid into the treasury.

With neither of these acts had the Treasury Department any concern.    Its sole authority is under the act of 1863, which limits its power to captured or abandoned property.

As the government has not chosen to proceed against this cotton under the act of 6th August, 1861, as having been sold for the purpose of promoting the insurrection, in the mode pointed out in the act, it cannot now claim to hold it on that ground by virtue of the seizure made in this case.

If this cotton was neither captured, abandoned, nor condemned under any act of Congress directing its confiscation, the government of the United States can only claim title to it by virtue of its right to succeed to the property owned by the conquered government.

This right must rest alone upon general principles of international law.

It was on the theory of succession or representation alone that the suits brought in England by the United States against the agents of the Confederacy could be maintained.

The Vice-Chancellor, after announcing as a clear principle of public law, that any government which *de facto* succeeds to any other, whether by revolution or restoration, conquest or reconquest, succeeds to all the public property of the displaced power, held that " this right is the right of succession. This right of representation is a right not paramount, but one derived through the displaced authority, and can only be enforced in the same way, and to the same extent, and subject to the same correlative obligations and rights, as if that authority had not been suppressed, and was itself seeking to enforce it." *United States* v. *Prioleau*, 2 Hem. & M. Ch. Cas. 560; *United States* v. *McRae*, 8 L. R. Eq. 75.

It is admitted, that when terms of sale are agreed on, and every thing the seller has to do with the goods is complete, the contract of sale becomes absolute between the parties, without actual payment or delivery, and the property, and the risk of accident to the goods, vest in the buyer.

When the sale is for cash, the vendee, though he acquires a right of property by the contract, does not acquire the right of possession until he pays or tenders the price.

When it is on a credit, the vendee, in the absence of stipulation, is entitled to immediate possession, as the right of possession and the right of property vest at once in him.

But this doctrine is subject to the important qualification, that this right of possession is not absolute, and will be defeated if the buyer becomes insolvent before he obtains the actual possession: for though the buyer has the property vested in him, so as to subject him to the risk of any accident, he has not an indefeasible right to the possession; and his insolvency without payment defeats that right, equally after the *transitus* has begun as before the seller has parted with the actual possession. *Bloxam* v. *Saunders*, 6 B. & C. 941.

There is manifestly a marked distinction between those acts, which, as between vendor and vendee, go to make a constructive delivery, and vest the property in the vendee, and that actual delivery which puts an end to the right of the vendor to

hold the goods as security for the price. *Arnold* v. *Delano*, 4 Cush. 38; *D'Aquila* v. *Lambert*, 2 Eden, 77; *Kinloch* v. *Craig*, 3 T. R. 119; *Mason* v. *Lickbarrow*, 1 H. Bl. 357.

But the title of the vendor is not entirely divested until the goods have come into the possession of the vendee. He has, therefore, a complete right, for just cause, to retract the intended delivery, and stop the goods *in transitu*. The cases in our courts of law have confirmed this doctrine, and the same law obtains in other countries. Comm. of Gaius, p. 232; 1 Domat, Civ. Law, 202, note.

The right of the vendor is not affected by the fact that he received the note or bond of the vendee in payment of the price. *Bell* v. *Moss*, 5 Wheat. 204. Nor is his lien lost by an express agreement that he will retain the goods for the vendee, either with or without rent. *Townley* v. *Crump*, 4 Ad. & Ell. 63; *Miles* v. *Groton*, 2 Cr. & M. 511; *Winkes* v. *Hassels*, 9 B. & C. 372.

As the seizure did not displace the title of the claimant, he is entitled to recover.

*Mr. Solicitor-General Phillips* for the United States.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

In *United States, Lyon et al.* v. *Huckabee*, 16 Wall. 414, we held that real property purchased by and conveyed to the Confederate States during the war passed to the United States at the restoration of peace, by capture; and we sustained the title of the United States thus acquired against a claim made by the vendors of the Confederate States, that the conveyance was obtained from them by duress. The same principle was recognized and acted upon in *Titus* v. *United States*, 20 Wall. 475. We have thus decided that the Confederate States government could acquire title to real property by purchase; and it is not easy to see why a different rule should be applied to personal property. The ownership of that, even more than real property, was required for the operations of the Confederacy. Contracts of sale made in aid of the rebellion will not be enforced by the courts; but completed sales occupy a different position. As a general rule, the law leaves the parties to illegal contracts where it finds

them, and affords relief to neither.  A sale of personal property, when completed, transfers to the purchaser the title of the property sold.

Whitfield's sale, in this case, was not on credit, but for bonds which passed from hand to hand as money.  The transaction, in this respect, was not different from a sale to the United States for any of their public securities payable at a future day.  The sale was complete when the bonds were accepted in payment.  The title then passed to the Confederate States without a formal delivery.  From that time, Whitfield ceased to be the owner of the cotton.

The claim, then, that he had the right to retain the possession of the cotton until the purchase-money was paid, because of the insolvency of the Confederate government, is not applicable to the facts established by the evidence, as the purchase-money had been paid before the insolvency.  But, if this were otherwise, it is not easy to see how his claim, growing out of his illegal contract as it does, can be enforced against the United States in the Court of Claims.  In *Sprott* v. *United States*, id. 459, it was decided that one owing allegiance to the government of the United States could not avail himself of the courts of the country to enforce a claim under a contract by which, for the sake of gain, he knowingly contributed to the " vital necessities of the rebellion."  For that reason, we refused to give effect to a purchase of cotton from the Confederate government.  This case is not distinguishable from that in principle.  Cotton, as we have often said, was, during the late war, as much hostile property as the military supplies and munitions of war it was used to obtain.  When Whitfield, therefore, sold his cotton to the Confederacy, and took their bonds in payment, he contributed directly to the means of prosecuting the rebellion.  He says in his petition, it is true, that his sale was not made to aid the rebellion ; but the purchase was clearly for that purpose, and no other.  This he could not but have known.  Under such circumstances, " he must be taken to intend the consequences of his own voluntary act."  *Hanauer* v. *Doane*, 12 Wall. 347.  By his sale, he knowingly devoted his cotton to the war ; and his rights must follow its fortunes.  The courts of the country would not relieve him against

one who held title by conveyance from the Confederate States, and under that title had obtained possession. Neither would they interfere in behalf of a purchaser from the Confederate States to enforce possession under his sale. But when his possession has been lost by reason of his sale, no matter how, the courts will afford him no relief against the loss. Having by his acts entered the lists against his rightful government, he cannot, if he loses, ask it for protection against what he has voluntarily done. In this case he seeks to enforce a right growing out of his contract of sale, which was tainted with the vice of the rebellion. It was a contract which could not have been enforced against him, and he is equally powerless under its provisions against others. He seeks in effect, by this action, to recover, in the courts of the United States, the purchase-money due from the Confederate States, upon the principle that a sale upon credit implies a guaranty of the solvency of the purchaser until the payment is made. We have already seen that such is not his position here; but if it were, having lost his possession, he has no standing in court for relief. He is not the owner of the property, and his lien is not one the courts of the United States will enforce.        *Judgment affirmed.*