Howry, Judge,
delivered the following concurring opinion:
Congress, by an act approved March 3, 1911, 36 Stat. L., 1139, enacted that—
“ The Court of Claims shall have jurisdiction to hear and determine the claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty-five, under the provisions of the act of Congress approved March twelfth, eighteen hundred and sixty-three, entitled ‘An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States,’ and acts amendatory thereof where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said net proceeds to the owners thereof, on the judgment of said court, and full jurisdiction is given to said court to adjudge said claims, any statutes of limitations to the contrary notwithstanding.”
This section is an amendment to the act commonly known as the abandoned or captured property act of March 12, 1863, 12 Stat. L., 820, set forth in the margin.[1]
*79 There is no purpose on my part to dispute the authority of the case of Whitfield v. The United States, 92 U. S., 165. There is a purpose, however, to consider that case (with the respect which all courts owe to the appellate jurisdiction) in connection with other decisions of the Supreme Court relating to the seizure of cotton with reference to the class of cases (of which that at bar is one) pending in this court by and in behalf of those from whose possession cotton was taken after June 1, 1865, sold, and the proceeds put into the Treasury. And with the same degree of respect to the legislative branch to consider section 162 of the Judicial Code in order to determine its scope and effect; whether the act in *80 question be so uncertain in its words as to confer or not confer rights and whether its language and necessarily implied meaning be such as to afford relief to the class of persons claiming the proceeds of cotton now in the Treasury, especially where the cotton had been taken from their actual possession. Probably not a baker’s dozen of these numerous petitioners can recover if the act under which the suits have been brought be so interpreted as to require proof of all the things which the administrative part of the Government now claim is necessary.'
The case of Whitfield v. United States, supra, Avas brought not only under the general jurisdiction of the Court of Claims, but likewise under the other acts relating to the seizure of abandoned property. There is an allegation of loyalty in the Whitfield petition which, however, was not proven. When the cotton of Whitfield was seized in September, 1865, he remonstrated, which resulted in negotiations between him, claiming at the time to be owner, and a supervising special agent of the Government engaged in the seizure which ended in a contract with Whitfield and the Government for putting the cotton seized in good order with, an agreement for the delivery of a part of the cotton to the United States and the other part to be retained by Whitfield as his property. That part of the cotton which Whitfield did not retain was shipped to market, sold, and the net proceeds paid into the Treasury. When suit was brought for the recovery of the proceeds of the sale of that taken away by the Government the court said that Whitfield sought to enforce a right growing out of his contract of sale with the Confederate States and that it was a contract which could not have been enforced against him because of “the vice of rebellion,” and that Whitfield was equally powerless to recover against others; that when possession of the cotton had been lost, no matter how, the courts would not afford relief against the loss. Recovery was denied as against the general principle that a sale upon credit implied a guaranty of the solvency of the purchaser until payment for the goods was made, the court at the same time declaring that such was not the position of Whitfield before the appellate court; *81 hut if it were, having lost his possession, he had no standing in court for relief. Thus the decision was made to rest upon petitioner’s acts because of his having entered the lists against his rightful Government by reason of which he could not, if he lost, ask for the protection of the proper authority against what he had voluntarily done. The principal ruling of the court was made upon the proposition that as a contract which could not have been enforced against a combination of persons doing an illegal act, Whitfield was consequently powerless to obtain relief against others. In its last analysis the want of loyalty was the reason for denying the relief. The taint of what the court denominated the vice of rebellion was the basis of the refusal to permit recovery. But passing from the vital matter of loyalty, which was necessary to be proven under the captured or abandoned property act, the court adverted to the principle that a sale upon credit implied a guaranty of the solvency of the purchaser until payment.
The question of an implied guaranty of solvency of the purchaser was not in issue, because, the court added, that “if it were” claimant was without standing in the court because of his loss of possession. The constructive possession of the vendee was accordingly held to be higher than the actual possession of the vendor. Of course this' latter part of the decision ought not to be said to be merely academic, but it is reasonably safe to say that the failure on the part of the court to apply the general rule respecting liens on property sold where the purchaser had failed by reason of insolvency to complete the purchase by making the necessary payment was not essential. Certainly the last point considered was the incident in the case. So far, however, as that phase of the matter was considered it was held that the lien could not be enforced by the courts of the United States because of the disloyal act of the petitioner in engaging to sell cotton for paper obligations of an aggregation of States held by the court of last resort to be not a de jure government, nor yet a de facto government, but a confederacy only, with belligerent rights in the prosecution of the war and with no right to issue paper or to acquire property in trade.
*82 From the foregoing statement it will be seen that the decision went further than the confiscation acts in that there was punishment meted out to the person. The summary seizure and appropriation of the cotton amounted to forfeiture in that there was' a denial of any opportunity to claimants in possession to be heard in defense in the courts after the seizure and before the sales. If there be no right to recover now, the forfeiture has become final.
Under the confiscation act of August 6,1861, the purchaser of condemned real property was held to take a fee, because, as said in Kirk v. Lind, 106 U. S., 316, the act had been aimed exclusively at the seizure and confiscation of that kind of property used to aid, abet, or promote rebellion. The offending thing was what the court designated as the insurrection. But the confiscation act of July 7, 1862, 12 Stat., 627, was accompanied by a resolution under which only a life estate could pass. ■
In McVeigh v. United States, 11 Wall., 259, it appeared that the property of a disloyal person had been seized and condemned; that the claim and answer of the owner of the property seized had been stricken from the files and the owner denied a hearing in the district court which decreed the condemnation. The appellate court declared that the liability and right were inseparable and a different result would be a blot upon our jurisprudence and civilization; that the foundation of the proceedings was the alleged criminality of the owner of the property and questions of his guilt and ownership were fundamental and therefore necessary to be considered in judicial proceedings before any confiscation could ensue. How much greater the reason and necessity for affording one claiming to be owner of property to be given the opportunity to appear and defend where the taking and appropriation occurred after the close of hostilities and the weakening of a hostile force could not have been the object?
In Corbett v. Knutt, 10 Wall., 464, it was held that the sales or transfers prohibited by the confiscation acts “were null and void as against the belligerent or sovereign right of the United States to appropriate and use the property desig *83 nated, but in no other respect and against no other party.” Accordingly the United States could seize the personal property of the Confederate States wherever found without reference to the confiscation acts or the abandoned or captured property act. But this was a belligerent right directed against a title and where the exclusive ownership was in the Confederate States. When it was directed by the Secretary of the Treasury to seize and then to sell anything belonging to the Confederate States, with the proceeds to be covered into the Treasury, is it not reasonable to infer that the intention was to give to individuals an opportunty to submit their claims to the proceeds before some court? And if it be true that the sale to the Confederate States was condemned by law, which made the sale void, is it not yet true that the property involved in this suit was never seized as the property of claimant’s intestate but as the property of the Confederate States ? But the United States labeled the proceeds of the sales of all cotton as a trust fund. Under these circumstances it would seem that the rights of vendors were not destroyed unless their rights were fixed by the status of the individual from whom it was taken because of his disloyalty, which barred any remedy, and not by his status when loyalty was no longer involved and the jurisdictional period of the original statute became extended by section 162.
Cases have been, decided by the Supreme Court where effect was given to the general amnesty proclamation of December 25,1868, and where disloyal claimants were allowed to maintain suits under the abandoned or captured property act which had been brought prior to the proclamation of amnesty and prior to the expiration of the terms of the act itself. In Mrs. Armstrong's case, 13 Wall., 154, and in Par-goud's case, 13 ibid., 156, the pardons became retroactive, reaching back because of the obliteration of the offense. Those decisions clothed both of the claimants there with an innocency in law which they did not possess when their suits were brought or when the act itself expired and they could not sue. As the time for bringing suits is now extended, does not the proclamation mentioned so operate as to effectuate the same result in the case at bar as in the Armstrong and Pargoud cases?
*84 There is another phase of the Whitfield case which seems to have been overlooked; or if not overlooked, ignored.
The action was instituted July 25,1868, and about a month before the bar of the statute of limitation had accrued. But none except the loyal could possibly recover under the original abandoned or captured property act, or under any other act because, for the purpose of obtaining judgment against the United States the act authorizing suits for the seizure of property abandoned or captured was exclusive. Hence, Whitfield relied upon the allegation that he was not within the proscribed class who were not loyal and therefore could not recover, but upon the contention that he was among the favored class of loyalists who were entitled to recover. True, there was another and further allegation “that on account of small gifts and acts of hospitality to soldiers and soldiers’ families not intended to promote or encourage the war he felt it safest to ask of the President the pardon and amnesty which he received, in the form of a pardon, accepted and took the oath required, all of which appear in the archives of the Government.” It does not appear that the petitioner did more than acknowledge the receipt of a warrant of pardon. Whether he took the oath of allegiance like thousands of others, including those who had been in the military service of the Confederate States and who had taken the same oath about the same time they were paroled, does not appear. The pardon itself not being produced, its special terms and limitations can not be stated. While petitioner probably did take the oath of allegiance, yet the President’s general proclamation of amnesty was not issued until some months after the Whitfield suit had been brought. Whitfield was therefore not within the terms of the general amnesty when he brought his suit.
In a leading early decision shown by the Supreme Gourt to be predicated upon the rules of international law war gave only the power for governments to confiscate, but does not itself confiscate the property of an enemy. Chief Justice Marshall, in the case of Brown v. United States, 8 Cranch, 143, declared this rule as stated, and said that the rule had never been changed. But he added that war, meaning the *85 acts of the belligerent powers, did not itself confiscate the property of an enemy; that the rule was based on the opinion of all who had ever written on the jus belli, and that “ the power to confiscate enemy property was confined to the legislature.” Later the Supreme Court affirmed this principle in the case of Mrs. Alexander's Cotton, 2 Wall., 419, by saying that—
“From usage, from the reasonings of enlightened publicists, and from judicial decisions, the seizure of property on land was to be regarded as substantially restricted to special cases dictated by the necessary operations of the war, and as excluding in general the seizure of private property for the sake of gain.”
Following this rule, the United States disclaimed the intent to confiscate personal property, except as stated by the confiscation acts, which, as the court subsequently declared, were acts providing for judicial proceedings where parties could be heard to defend before condemnation.
A different question arises in cases of conquest by a government against another as it relates to actual ownership and possession of property belonging to the conquered public enemy. In such cases the property of an enemy government and in the possession of such enemy, nation, or state reverts to the conqueror. Judicial proceedings are not necessary to pass title in such cases. Private rights of ownership stand upon a wholly different ground.
There was a constant disclaimer on the part of the Federal authorities that there was any intent to confiscate the private property of individuals anywhere. The true intent found expression in those acts relating to confiscation which were aimed and directed at the leaders of the secession movement. In the crisis of the Civil War assurances were extended to loyalists to remain faithful, and those not loyal were urged to become so when the great issue hung in the balance. It is historical that President Lincoln reluctantly approved the acts relating to confiscation and which, by reason of the existing confusion, were enforced in the most limited way. A veto message of proposed confiscation proceedings was understood to have been prepared by the President. National Intelligencer, July 18, 1862; Senate Journal, 37 Cong., 2d *86 sess., July 17, 1862, pp. 872-874. In the case of Conrad v. Waples, 96 U. S., 279, it was held that confiscation under the act of July 17, 1862, applied only to the property of persons who might thereafter be guilty of acts of disloyalty. It was a curious result that financially confiscation was a failure, and as a measure of punishment equally insufficient to accomplish any useful purpose because of the subsequent judicial interpretations that a “rebel” could not be denied the right to a hearing upon the seizure of his property. Only the property of a few leaders was seized, whilst those in arms and noncombatants very generally suffered, and particularly those who were cotton owners.
The seizure of property as. a belligerent right was presented to the Supreme Court after the close of the war in a number of decisions.
Though it was held in the case of Miller v. United States, 11 Wall., 268, that in a recognized great war those engaged against the Government were to be regarded as “ enemies,” the severe principle for appropriating private property disappeared. In the case of Williams v. Bruffy, 96 U. S., 176, the Supreme Court, in referring to the necessity of some concession to belligerent rights, declared that such concessions depended upon considerations of justice, humanity, and policy controlling the Government. This decision placed Confederate soldiers and military officers on the footing of those engaged in lawful war and exempted them from liability for acts of legitimate warfare. In this'last decision the Confederate Government . was distinguished from each kind of the defined de facto governments. The court said that when its military forces were overthrown it utterly perished, and with it all its enactments. The Confederacy, not having been either a de jure or a de facto government and the matter of loyalty having been eliminated when the recent legislation was enacted, can it not be reasonably supposed that with knowledge of these conditions and the reason for seizing cotton after June 1, 1865, being no longer necessary because of the collapse of the Confederacy, the Congress framed the act under which these cases are brought with the intent to have the appellate court *87 review its decisions in tbe light of all the history of' that period? In the case of Briggs v. United States, 143 U. S., 346, the seizure of cotton was considered the great means of procuring supplies to carry on the war. Congress knew that the Supreme Court had sustained the liberal view in the case of United States v. Klein, 13 Wall., 168, followingPadelford’s case, 9 Wall., 56, in the statement that the legislative bodies had intended to restore property not only to loyal owners, but to those who had been hostile and might later become loyal; that the restoration of property to all real owners claiming under the abandoned or captured property act became the duty of the Government, and such restoration was the absolute right of the pardoned persons, the Government having constituted itself the trustee, not only for claimants protected by the act of 1863, but for all who might later be recognized as entitled. Pardon and restoration of political rights, said the appellate court, in these cases were in return for the oath of allegiance and its fulfillment.
But unfortunately Klein’s case was not decided until after the period had expired for bringing suit, and that probably afforded Congress another reason for reviving the original act in the light of these decisions.
In the case of Mauran v. Insurance Co., 6 Wall., 14, it was substantially declared what we all know — that the Confederate power, notwithstanding its illegal character, impressed its will over eleven States. Whatever kind of gov- . eminent it was, the citizens of these States had to trade with it, and had to use -its paper obligations with each other and with the Confederate authorities. The nonintercourse laws could not be applied to the cases of citizens of those States within the Confederate lines if they resided there. May not Congress by the act of 1911 have had in view those decisions which decided that there was no power in the Government of the United States to continue to take property temporarily for the purpose of destroying the credit of the hostile forces in the absence of a legislative declaration confiscating it? And may not those bodies have thought that the Secretary of the Treasury was without lawful authority to bring into *88 practical operation acts of confiscation by a mere order, there being no belligerent power in existence? Even if a department order was given in May, 1865, may not Congress in adopting section 162 of the Judicial Code have been actuated by the intent to afford relief because there was no necessity to make seizures when hostilities had ceased and peace had been practically restored?
In the case of Texas v. White, 7 Wall., 700, the court held that legislative acts intended to give effect to ordinances of secession were absolutely null, but the State did not cease to be a State, nor her citizens to be citizens of the United States. In Home Ins. Co., 22 Wall., 99, the court declared the validity of judicial and legislative acts touching the civil government and the regular administration of the laws so as not to loosen the bonds of society when not hostile in their purpose, “and did not impair the rights of citizens under the Constitution”-; and, tried by the rule acts of incorporation in the States were treated as valid. The obligations of the seceding States and of the Confederate States constituted illegal issues of money, but citizens living there were obliged to trade exclusively in the moneyed obligations of the Confederate States.
In Brown’s case, 20 Wall., supra, it was declared by the Supreme Court that enemy’s property found on land could be seized a/nd condemned as a necessary consequence of war, but the court in that case held that such property could not be condemned without an act of Congress authorizing its confiscation. The right remained with the private owner until the sovereign authority chose to bring the matter of condemnation into operation, and until the legislative will was expressed no power of condemnation could exist in the courts. This was but the declaration of the rules of international law respecting belligerents’ property.
The amnesty extended just after the time for the filing of suits under the abandoned or captured property act condoned “ all offenses ” by the disloyal, arising from participation, direct or implied, conditioned upon the offender making no claim to property or the proceeds of any property sold “ by the order, judgment, or decree of a court under the *89 confiscation laws.” The pardon, said the court in Carlisle’s case, 16 Wall., 163, “relieved claimants of the proceeds of abandoned or captured property from the consequences of participation in the rebellion.”
Amnesty, the court declared, “ forever closed the eyes of the court to the perception of previous disloyalty as an element in its judgment, no rights of third parties having intervened.” Loyalty or disloyalty being eliminated and the non-intercourse laws being without application, the whole matter comes down to the proof of ownership and the right to be reimbursed by reason of the lien or charge against the property where the proceeds of sales were placed in the Treasury.
Section 162 does not dispense with proof of ownership and could not with reason have done so, because Congress never intended to provide for anybody but owners. In reviving the original act Congress had knowledge that the proceeds of sales were yet held in trust, and those bodies probably concluded that with the loyalty phase of the matter eliminated there was no necessity for legislation to be more explicit. The Supreme Court had declared in terms that the proceeds of sales constituted the trust fund, which impliedly meant that at some future time remedies might be provided so as to dispense with proof of loyalty. This implication results from the statement of the court that the property of the original owner was in no case absolutely divested. Taken in connection with the suggestion that confiscation was repudiated by the Supreme Court it is proper to say that future remedies were deemed by the appellate court as probable.
The case of Semmes v. United States, 91 U. S., 23, involved the seizure and condemnation of land under the confiscation act of July 17, 1864, and it was held there that the special pardon would not restore rights to property sold under a decree of condemnation as against a purchaser in good faith and for value. That was a case where the special pardon contained the provision that the claimant should not claim any property or the proceeds of any property that had been sold by the judgment or decree of a court'of the United States. In the subsequent case of Wallach v. Van Riswick, *90 92 U. S., 213, the court spoke of tlie anomalies growing out of congressional legislation similar to the anomalies growing out of certain statutes in Elizabeth’s time; and in answer to the suggestion that the proclamation of amnesty restored rights .of property declared that “ conceding amnesty did restore what the United States held when the proclamation was issued it could not restore what the United States had ceased to hold.” The state of affairs in these two cases was not the same as in the class of cases we are now considering, because the owners of the cotton seized had not forfeited their right to recover the proceeds in the Treasury arising from the sales of cotton. These proceeds can be made to take the place of the property originally taken and not yet declared forfeited. The power of Congress over the fund is as good now as it was when the original abandoned or captured property act was passed, and Congress can have the fund administered by the courts by suitable legislation at any time.
The Supreme Court in Whitfield’s ease suggested that the petitioner there sought “ in effect ” to recover the purchase money never paid to him by the Confederate States upon the principle that a sale upon credit implied a guaranty of the solvency of the pui’chaser until the payment was made; that by reason, however, of having lost possession, Whitfield had 'no standing in court for relief; and denying the right of ownership, the court declared that his lien was not one the courts would enforce, though the court did recognize the general principle of a vendor’s right to enforce his lien because of the insolvency.
My comments relate to what the court stated to be the right to recover under the abandoned or captured property act; and, of course, do not embrace any other question independent of that act.
A buyer is deemed to be insolvent who either has ceased to pay his debts in the ordinary course of business, or apparently can not pay his debts as they become due. Chandler v. Fulton, 10 Tex., 2, 12; O’Brien v. Norris, 16 Md., 122, 132; Durgy v. O’Brien, 123 Mass., 12; Tuthill v. Skidmore, 124 N. Y., 148; Queen v. Sadler’s Co., 10 H. L. C., 425; Toof *91 v. Martin, 13 Wall., 47; Herrick v. Borst, 4 Hill, 653; Lee v. Kilburn, 3 Gray, 600; Benedict v. Schaettle, 12 Ohio St., 515, 519; Bloomingdale v. R. R. Co., 6 Lea, 616, 621. And it was substantially held that in the proof of insolvency it makes no difference as to how it came about. The insolvency necessary to be proved is to show reasonable certainty as to inability to pay debts as they fall due. Biddlecombe v. Bond, 4 A. & E., 332; Hays v. Mouille, 14 Pa. St., 48, 52; Naylor v. Dennie, 8 Pick., 205; Durgy v. O’Brien, 123 Mass., 13; Secomb v. Nutt, 14 B. Mon., 324; Reynolds v. R. R. Co., 53 N. H., 580, 592; More v. Lott, 13 Nev., 376, 383; Crummey v. Raudenbush, 55 Minn., 426, 428; Atwater v. Bank, 152 Ill., 605. By implication of law a lien on goods continues for the price notwithstanding the property in the goods may have passed to the buyer so long as the seller is in possession. The authorities, English and American, are numerous on this point. An unpaid seller having in custody the goods sold and retaining actual possession of the goods as against a buyer may yet enforce his lien in case of the buyer’s insolvency before the maturity of the obligation given. Arnold v. Delano, 4 Cush., 33; Milliken v. Warren, 57 Me., 46; and see Miles v. Gorton, 2 Cr. & M., 504, 512; Gunn v. Bolckow, L. R. 10, Ch. App., 491, 503; Moses v. Raisin, 14 Fed., 772, 774. The authorities cited in the opinion of the court establish the doctrine of liens in cases of insolvency at common law and as said in Benjamin on Sales, the lien for the unpaid price finds support in American cases. In Whitfield’s case it has not found support because the transaction was one between common belligerents against the United States.
The crux of the Whitfield decision and of some analogous cases to it was the aid given to the rebellion. The act of disloyalty which barred recovery in all cases was the disloyalty named in the original abandoned or captured property act. The act of disloyalty precluding the right to recover in those cases where recovery has been denied is not now to be recognized because of the general amnesty removing all taint of disloyalty.
In the case of the United States v. Villalonga, 90 U. S., 42, the Supreme Court affirmed the limited ownership in *92 such cases with the right to assert the same as “ a lien or charge upon the property” — excluding consignors through a factor where the consignors had given aid and comfort to the rebellion. The court in that case was dealing with the original abandoned or captured property, without reference to the effect of amnesty.
The act under which this case is being considered, 36 Stat., 1139, supra, gives the court “ full jurisdiction ” * * * “ to adjudge such claims.” That is, “ to hear and determine the claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty-five, under the provisions of the act of Congress approved March twelfth, eighteen hundred and sixty-three, entitled, ‘An act for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States,’ and acts amendatory thereof where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States.” If it be required in the face of this language to prove loyalty, and there is necessity yet to apply punishment for any act consequent upon disloyalty during the progress of the war, then it would seem there is nothing left to adjudge pursuant to the terms of the act under which these suits are brought — except to order a dismissal of practically all of the cases pending under section 162, Judicial Code.
The general contentions of the Government in this and kindred cases are that the bar of the statute of limitations only is waived; that section 162 of the Judicial Code did not enlarge the scope of the original abandoned or captured property act which provided only for the relief of loyal owners who could trace the money derived from sales to the Treasury. The effect of these contentions is that the act is almost wholly destitute of any meaning and but an idle and misleading piece of legislation. The defense consequently rests upon the fact of disloyalty, and that not only is ownership not proved but the right to enforce the lien or charge upon the property as in ordinary cases can not be enforced because of the seller’s participation in the rebellion. It is contended that this is so notwithstanding there may have been a failure of consideration.
*93 The question naturally arises, Did Congress act upon the belief that there could be no grades of disloyalty? Legislating with knowledge that there was nothing left from the wreck, outside of lands and some live stock, except a few thousand bales of cotton in that section; that much of the staple had been burned by the Confederate authorities to keep it from falling into the hands of the Union forces; that practical peace existed and all claimants were loyal; that confiscation laws and previous legislation in the nature of confiscation acts were no longer sought to be enforced; and, finally, with knowledge that the Secretary of- the Treasury, afterwards Chief Justice Chase (supported by many publicists, statesmen, and jurists), in the beginning directed seizures of cotton, but subsequently took the ground that there was no consideration paid to private owners who had been in hostility, did Congress go to the trouble of enacting something its able membership knew had no meaning beyond the removal of the bar of the statute of limitations? Congress could not — and did not — attempt to remove the effect of the amnesty proclamation.
Congress knew from the official reports before the act of 1911 was passed that about all the proceeds arising from the sales of cotton seized after June 1,1865, were proceeds which had been derived from the disposition of cotton seized as the property of the Confederate government. The order to seize cotton after the close of hostilities included only that of the extinct government, or those forfeiting title by the disloyal act of selling or subscribing property to the insurgent organization. At the same time the United States denied that the organization known as the Confederate States could lawfully acquire, possess, or convey any description of property. (Instructions of the Secretary of the Treasury McCulloch to the general agent of the Treasury Department.) Did Congress by its latest legislation intend that property taken after the fall of the hostile power and as late as June 1, 1865, should be appropriated permanently for the use of the United States ?
Where the language of a statute is ambiguous, or the meaning doubtful, resort may be had to the surrounding circumstances, the history of the times, and the defects which *94 tbe statute was intended to remedy to determine the intent. That which is implied in a statute is as much a part of it as what is expressed. United States v. Babbitt, 1 Black, 55; Gelpecke v. City of Dubuque, 1 Wall., 175; County of Wilson v. National Bank, 103 U. S., 778. In Sturges v. Crowninshield, 4 Wheat., 202, Chief Justice Marshall said that the spirit of an instrument was to be respected no less than its letter. A notable application of this is found in the case of Church of Holy Trinity v. United States, 143 U. S., 462. In Bernier v. Bernier, 147 U. S., 242, the court held that when a statutory provision admits of more than one construction that one will be adopted which best serves to carry out the purposes of the act. It is a rule often applied that the importance of rights involved forbids technical or narrow construction. In United States v. Saunders, 120 U. S., 126, the court thought that the construction must be measured not only by its exact words but by its apparent general purpose. In United States v. Goldenburg, 168 U. S., 95, the court held that where cogent reasons existed for the belief that the language used does not fully and accurately disclose the intent, specific language must yield to arrive at the true intent. It is enough to stop here with these familiar rulings on the general principle which charges courts with the duty of ascertaining the intent and all the circumstances surrounding the passage of an act.
As to the immediate case in hand, the plaintiff is not entitled to recover independent of the matter of ownership or of any lien or charge, because the proceeds of the sale of the cotton taken from the decedent have never been traced and can not be identified as a part of the fund in the Treasury. Besides, the Intermingled Cotton cases, 92 U. S., 651, operated as a bar to any remedy to recover the indistinguishable proceeds from any sales made of the intestate’s cotton, inasmuch as such proceeds as reached the Treasury are payable as the amount of each can be ascertained. The interests of others to be recognized by an apportionment of the fund require that equity should consider the cases where the proceeds can be traced all together, and to that end it would be necessary to consolidate the cases of all claimants having an interest in the specific fund. "
*95 As to the general question involving the matter of ownership and the right to enforce the lien or charge as at common law in this and kindred cases where there is sufficient proof, the court can not make the law different from that declared in the Whitfield decision. Whether Congress expected the appellate court to modify the rule declared in that case because of the other decisions rendered by the same tribunal must be left to the Supreme Court to determine.
Whatever the Congress intended or expected is a matter of conjecture. But in any event it is necessary for this court before we can proceed further to have the questions in issue settled either by the appellate court or by further legislation.
For the reasons stated in this and the court’s opinion, I concur in the order directing that the petition be dismissed.

Be it enacted -by the Senate and Souse of Representatives of the United States of America in Congress assembled, That it shall be lawful for the Secretary of the Treasury, from and after the passage of this act, as he shall from time to time see fit, to appoint a special agent or agents to receive and collect all abandoned or captured property in any State or Territory, or any portion of any State or Territory, of the united States designated as in insurrection against the lawful Government of the united States by the proclamation of the President of July first, eighteen hundred and sixty-two : Provided, That such property shall not include any kind or description which has been used, or *79 which was intended to be used, for waging or carrying on war 'against the united States, such as arms, ordnance, ships, steamboats, or other water craft, and the furniture, forage, military supplies, or munitions of war.
Sec. 2. And be it further enacted, That any part of the goods or property received or collected by such agent or agents may be appropriated to public use on due appraisement and certificate thereof, or forwarded to any place of sale within the loyal States, as the public interests may require; and all sales of such property shall be at auction to the highest bidder, and the proceeds thereof shall be paid into the Treasury of the united States.
Sec. 3. And he it further enacted, That the Secretary of the Treasury may require the special agents appointed under this act to give a bond, with such securities and in such amount as he shall deem necessary, and to require the increase of said amounts and the strengthening of said security as circumstances may demand; and he shall also cause a book or books of account to be kept, showing from whom such property was received, the cost of transportation, and proceeds of the sale thereof. And any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.
Sec. 4. And he it further enacted, That all property coming into any of the United States not declared in insurrection as aforesaid from within any of the States declared in insurrection, through or by any other person than any agent duly appointed under the provisions of this act, or under a lawful clearance by the proper officer of the Treasury Department, shall be confiscated to the use of the Government of the United States. And the proceedings for the condemnation and sale of any such property shall be instituted and conducted under the direction of the Secretary of the Treasury, in the mode prescribed by the eighty-ninth and ninetieth sections of the act of March second, seventeen hundred and ninety-nine, entitled “An act to regulate the collection of duties on imports and tonnage.” * * *
Seo. 5. Relates to officers’ compensation.
Sec. 6. Relates to the duties of officers and enlisted men of the Army and Navy.
Sec. 7. Relates to maritime prizes.