**UNITED STATES of America, Plaintiff,**

v.

**Richard STEINMETZ, Defendant.**

**Civ. A. No. 90–5036.**

United States District Court,
D. New Jersey.

May 13, 1991.

As Amended June 3, 1991.

Michael Chertoff, U.S. Atty. by Susan Cassell, Asst. U.S. Atty., Newark, N.J., and Janis G. Schulmeisters, Mark E. Schaefer, Sp. Attys., Torts Branch, Civ. Div., U.S. Dept. of Justice, New York City, for U.S.

Antranig Aslanian, Jr., Fort Lee, N.J., for defendant.

OPINION

DEBEVOISE, District Judge.

I. THE PROCEEDINGS

In this action plaintiff, the United States of America, seeks to recover from defendant, Richard Steinmetz, a ship's bell taken

from the celebrated Confederate warship, the CSS ALABAMA. In response to an order to show cause, Mr. Steinmetz delivered the bell to the Court. A hearing was held on January 4, 1991. The hearing not only developed evidence required to dispose of this case; it was also a celebrative event. The final encounter of the CSS ALABAMA was recalled. Each student in the sixth grade of Maplewood's Middle School struck the bell bringing forth once again the vibrant tone heard many times at sea during the years 1862 to 1864.

Since the bell had been deposited in Court there was no need for preliminary injunctive relief. Mr. Steinmetz answered and counterclaimed, seeking (1) a determination that the bell is his property, (2) compensation on a theory of *quantum meruit* and (3) compensation on a theory of unjust enrichment. I suggested to the parties that they cross-move for summary judgment and, pending a hearing on the motion, seek to arrive at a fair and reasonable disposition of the case. Unfortunately, the efforts to reach agreement failed and it thus became necessary to rule upon cross-motions for summary judgment.

## II. THE FACTS

Many events preceded the arrival of the bell in Newark. These events are recounted in the Official Records of the Union and Confederate Navies in the War of the Rebellion (Government Printing Office 1896), in the works of recognized historians of the Civil War, in the testimony in this case of Naval Historian William S. Dudley and in the testimony of Mr. Steinmetz, an antique dealer who has great expertise in the field of military artifacts. These events can be summarized as follows:

In 1847, fourteen years before the start of the Civil War, the American fleet was engaged in the war with Mexico. On one of the Navy's ships two officers shared a cabin, Lt. Raphael Semmes and Lt. John Winslow. In 1864 the paths of these two officers were to cross again.

In 1861 James D. Bulloch, representing the Confederate States of America, proceeded to England. His mission was to obtain ships for the Confederacy. Among other activities, he arranged for two warships to be built in Liverpool. One was the vessel named the Florida; the other was the ALABAMA.

Thomas S. Dudley was the United States Consul in Liverpool. His most important assignment was to seek enforcement of Britain's Foreign Enlistment Act which forbade the construction and arming of warships in British territory for a belligerent power. Despite Dudley's efforts the British authorities permitted the Florida to depart from Liverpool on the technical ground that she was not a warship since her arms were shipped out separately on another vessel.

James M. McPherson in his *Battle Cry of Freedom* describes the departure of the other ship, the ALABAMA, from Liverpool and its subsequent activities:

The willingness of British officials to apply a narrow interpretation of the Foreign Enlistment Act encouraged Bulloch's efforts to get a second and larger cruiser out of Liverpool in the summer of 1862. In a contest of lawyers, spies, and double agents that would furnish material for an espionage thriller, Dudley amassed evidence of the ship's illegal purpose and Bulloch struggled to slip through the legal net closing around him by July. Once again bureaucratic negligence, legal pettifoggery, and the Confederate sympathies of the British customs collector at Liverpool gave Bulloch time to ready his ship for sea. When an agent informed him of the government's belated intention to delay the ship, Bulloch sent her out on a 'trial cruise' from which she never returned. Instead she rendezvoused at the Azores with a tender carrying guns and ammunition sent separately from Britain. Named the ALABAMA, this cruiser had as her captain Raphael Semmes, who had already proved his prowess as a salt-water guerrilla on the now defunct CSS Sumter. For the next two years Semmes and the ALABAMA roamed the seas and destroyed or captured 64 American mer-

chant ships before meeting the USS Kearsarge off Cherbourg in June of 1864.

In June of 1864 the ALABAMA entered the harbor of Cherbourg and obtained permission from the French authorities to land prisoners, dock the ship for repairs and take on supplies. Meanwhile, the USS Kearsarge, under the command of Captain John Winslow, entered Cherbourg and then positioned herself in international waters beyond the harbor mouth.

Captain Semmes decided to do battle. By Saturday night, June 18, his preparations were complete. Between nine and ten o'clock on June 19 the ALABAMA proceeded to sea, accompanied by the French ironclad Frigate Couronne, some French pilot boats and the English steam yacht, the Deerhound. The Kearsarge awaited seven miles off shore.

John Kell, executive officer of the ALABAMA, has described the battle:

We now prepared our guns to engage the enemy on our starboard side. When within a mile and a-quarter he wheeled, presenting his starboard battery to us. We opened on him with solid shot, to which he soon replied, and the action became active. To keep our respective broadsides bearing we were obliged to fight in a circle around a common center, preserving a distance of three quarters of a mile. When within distance of shell range we opened on him with shell. The spanker gaff was shot away and our ensign came down. We replaced it immediately at the mizzen masthead.

The firing now became very hot and heavy. Captain Semmes, who was watching the battle from the horse block, called out to me, "Mr. Kell, our shell strike the enemy's side, doing little damage, and fall off in the water; try solid shot." From this time we alternated shot and shell.

The battle lasted an hour and ten minutes. Captain Semmes said to me at this time (seeing the great apertures made in the side of the ship from their 11–inch shell, and the water rushing in rapidly), "Mr. Kell, as soon as our head points to the French coast in our circuit of action,

shift your guns to port and make all sail for the coast." This evolution was beautifully performed; righting the helm, hauling aft the fore-trysail sheet, and pivoting to port, the action continuing all the time without cessation,—but it was useless, nothing could avail us.

Before doing this, and pivoting the gun, it became necessary to clear the deck of parts of the dead bodies that had been torn to pieces by the 11-inch shells of the enemy. The captain of our 8–inch gun and most of the gun's crew were killed. It became necessary to take the crew from young Anderson's gun to make up the vacancies, which I did, and placed him in command. Though a mere youth, he managed it like an old veteran.

Going to the hatchway, I called out to Brooks (one of our efficient engineers) to give the ship more steam, or we would be whipped.

He replied she "had every inch of steam that was safe to carry without being blown out!."

Young Matt O'Brien, assistant engineer, called out, "Let her have the steam; we had better blow her to hell than to let the Yankees whip us!"

The chief engineer now came on deck and reported, "the furnace fires put out," whereupon Captain Semmes ordered me to go below and "see how long the ship could float."

I did so, and returning said, "Perhaps ten minutes."

"Then, sir," said Captain Semmes, "cease firing, shorten sail, and haul down the colors. It will never do in this nineteenth century for us to go down and the decks covered with our gallant wounded."

This order was promptly executed, after which the Kearsarge deliberately fired into us five shots! In Captain Winslow's report to the Secretary of the Navy he admits this, saying, "Uncertain whether Captain Semmes was not making some ruse, the Kearsarge was

stopped."[1]

Was this a time,—when disaster, defeat and death looked us in the face,—for a ship to use a ruse, a Yankee trick? I ordered the men to "stand to their quarters," and they did it heroically; not even flinching, they stood every man to his post. As soon as we got the first of these shot I told the quarter-master to show the white flag from the stern. It was done. Captain Semmes said to me, "Dispatch an officer to the Kearsarge and ask that they send boats to save our wounded—ours are disabled." Our little dingey was not injured, so I sent Master's Mate Fulham with the request. No boats coming, I had one of our quarter boats (the least damaged one) lowered and had the wounded put in her. Dr. Galt came on deck at this time, and was put in charge of her, with orders to take the wounded to the Kearsarge. They shoved off in time to save the wounded.

When I went below to inspect the sight was appalling! Assistant Surgeon Llewellyn was at his post, but the table and the patient on it had been swept away from him by an 11–inch shell, which made an aperture that was fast filling with water. This was the last time I saw Dr. Llewellyn in life. As I passed the deck to go down below a stalwart seaman with death's signet on his brow called to me. For an instant I stood beside him. He caught my hand and kissed it with such reverence and loyalty,

, —the look, the act, it lingers in my memory still! I reached the deck and gave the order for "every man to save himself, to jump overboard with a spar, an oar, or a grating, and get out of the vortex of the sinking ship."

As soon as all were overboard but Captain Semmes and I, his steward, Bartelli, and two of the men—the sailmaker, Alcott, and Michael Mars—we began to strip off all superfluous clothing for our battle with the waves for our lives. Poor, faithful-hearted Bartelli, we did not know he could not swim, or he might have been sent to shore—he was drowned. The men disrobed us, I to my shirt and drawers, but Captain Semmes kept on his heavy pants and vest. We together gave our swords to the briny deep and the ship we loved so well! The sad farewell look at the ship would have wrung the stoutest heart! The dead were lying on her decks, the surging, roaring waters rising through the death-wound in her side. The ship agonizing like a living thing and going down in her brave beauty, settling lower and lower, she sank fathoms deep—lost to all save love, and fame, and memory! ...

Captain Semmes, Lt. Kell and certain others of the ALABAMA's crew were picked up by the English yacht Deerhound. The Deerhound, despite assurances to Captain Winslow that she was merely assisting him in picking up the prisoners, took her

1. Captain Semmes had acquired a reputation for resorting to ruses. Dr. Dudley testified:

"... in the early part of the Alabama's career, the Alabama attacked ... the USS Hatteras off the coast of Texas.... Semmes used a ruse, a ruse de guerre, a ruse of war where he pretended to be a British ship ... Alabama had permitted the Hatteras to overhaul her ... and Alabama says, send your boat. The Alabama people had been told reserve fire until you hear the word 'Alabama.' And Kell is told now ... announce who we are. You are now approaching the Confederate States Steamer Alabama and blast away.

Now, that was a ruse, and it was that ruse that was commonly done. You often fly the flags of a different power to try to defraud your enemies, but word of this had gotten around and Winslow warned his men, we must be careful of the crafty dealer, clever Semmes."

An account of the battle between Kearsarge and Alabama written by Arthur Sinclair IV, a lieutenant on the Alabama absolves Captain Winslow of deliberately firing upon a ship which had surrendered:

"It being now apparent that the Alabama could not float longer, the colors are hauled down, and the pipe given, 'All hands save yourself....' The Kearsarge evidently failed to discover at once our surrender, for she continued her fire after our colors were struck. Perhaps from the difficulty of noting the absence of a flag with so much white in it, in the powder smoke. But, be the reason what it may, a naval officer, a gentleman by birth and education, would certainly not be guilty of firing on a surrendered foe; hence we may dismiss the matter as an undoubted accident."

new passengers to England. For allowing this to happen Captain Winslow was later officially reprimanded by Secretary of the Navy Gideon Welles.

It goes without saying that the ship's bell, which is the subject of this case, accompanied the ALABAMA as "she sank fathoms deep." The ALABAMA still rests where she sank, but the bell was salvaged. Mr. Steinmetz traced its separate history.

In 1979 Mr. Steinmetz participated in an antique gun show in London. A dealer informed him that he knew where the bell of the CSS ALABAMA was located, and Mr. Steinmetz asked to see it. The dealer took Mr. Steinmetz to Hastings on the English coast where an antique dealer, a Mr. Walker, showed him the bell and documentation concerning it. It purportedly came from the Isle of Guernsey off the French coast.

Mr. Steinmetz was skeptical, but he paid a deposit, took possession of the bell and proceeded to Guernsey to check it out.

Guernsey fishermen have a sideline—wreck stripping. Mr. Steinmetz visited a Guernsey friend and the friend introduced him to various persons who dealt in shipwrecks and salvage. When these persons were shown the bell they identified it as a bell which had hung in a Guernsey bar. It developed that a diver, William Lawson, had salvaged the bell in about 1936 and most likely had traded it at the bar for drinks. There it hung until World War II. The Germans captured Guernsey from the British. Thereafter, the bar was destroyed in a British bombing raid.

After the destruction of the bar the bell passed from hand to hand until it was acquired in 1978 by the Hastings antique dealer.

Satisfied with the authenticity of the bell, Mr. Steinmetz completed the purchase and brought it to the United States. He had given the dealer other antique items having a value of approximately $12,000 in exchange for the bell.

In 1979, after returning to the United States, Mr. Steinmetz offered the bell to the Naval Academy. The Academy was unwilling or unable to trade or purchase it. Mr. Steinmetz put the bell on a shelf until December 1990, at which time he placed it in the Harmer Rooke Gallery for auction.

The Bell was advertised in the Gallery's catalogue. Alert Naval authorities noticed the advertisement and claimed entitlement to the bell. Mr. Steinmetz resisted the claim, and this action ensued.

## III. DISPOSITION OF SUMMARY JUDGMENT MOTIONS

Each party either has, or by direction of the court is deemed to have, moved for summary judgment. Judgment shall be rendered if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). There are no genuine issues as to any material facts and I conclude that as a matter of law the United States is entitled to a judgment in its favor.

A. *Right of Capture.* The bell is the property of the United States both by the right of capture and by virtue of the fact that the United States is successor to the rights and property of the Confederate States of America. Salvage rights cannot be asserted against the United States in this case under 46 U.S.C.App. § 781, because the two year limitation period has expired, 46 U.S.C.App. § 745, and the United States has not abandoned the CSS ALABAMA or any of its equipment.

■ Maritime law historically recognizes that the capture of an enemy's vessel confers title and ownership upon the captor. *The Adventurer,* 12 U.S. (8 Cranch) 221, 226, 3 L.Ed. 542 (1814); *The Alexander,* 1 Gall. 532, 1 Fed.Cas. 357, No. 164 (1813), (Story, J.), *aff'd,* 12 U.S. (8 Cranch) 168, 3 L.Ed. 524 (1814). As observed by the United States Supreme Court in *The Florida,* 101 U.S. 37, 25 L.Ed. 898 (1879):

> The title to captured property always vests primarily in the government of the captors.

*Id.* 101 U.S. at 42.

Prior to its sinking, Captain Semmes of the CSS ALABAMA surrendered his vessel

to USS KEARSARGE. Captain Semmes' act of surrender conferred upon the United States title and possession of CSS ALABAMA and all of her appurtenant equipment prior to its sinking. The undisputed historical record establishes that USS KEARSARGE captured CSS ALABAMA before the latter sank on June 19, 1864. KEARSARGE was in constructive possession of ALABAMA, positioned across ALABAMA's bow thwarting escape and able to deliver unanswerable raking fire.

■ B. *Right of Succession.* Also CSS ALABAMA is the property of the United States as the successor to all the rights and property of the Confederate Government. *See J.B. Moore's Digest of International Law* (1906), Vol. 1, Section 26. This principle was recognized by the English Courts in litigation following the Civil War in such cases as *The Rappahannock* (1866), 36 L.J. Adm. 9 and *U.S. v. Prioleau* (1865), 35 L.J. Chancery N.S. 7. Moore cites *Prioleau* in Section 26 on *Succession in Case of Unsuccessful Revolt.*

> The Confederate Government having been dissolved, and the Confederate states having submitted to the authority of the United States Government, the latter government filed a bill praying to have the cotton, which had arrived at Liverpool, delivered up to them, and for an injunction and receiver.... Upon motion for an injunction receiver, *held* that the property in question was now the property of the United States Government, but that they must take it subject to the obligations entered into respecting it by the *de facto* Confederate Government.

Moore's Digest at Section 26, p. 64. Moore also cites several instances where Confederate warships were surrendered to United States agents as property of the United States. *Id.* at 64, 65; *see United States, Lyon, et al. v. Huckabee,* 83 U.S. (16 Wall.) 414, 434–35, 21 L.Ed. 457 (1872).

C. *Lack of Abandonment.* Article IV, Section 3, Clause 2 of the United States Constitution provides:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

■ Thus, under the above clause only Congress and those persons authorized by Congress may dispose of United States property pursuant to appropriate regulations.

In the similar case of *Hatteras, Inc. v. USS HATTERAS, her engines, etc., in rem, and United States of America, in personam,* 1984 AMC 1094, 1096 (1981), *aff'd* without opinion, 698 F.2d 1215 (5th Cir.1983) involving a claim to the wreck of USS HATTERAS and artifacts from it, the District Court for the Southern District of Texas held that although the wreck had lain untouched since the Civil War, title and ownership of the wreck remained with the United States.

Citing numerous cases, the Court observed:

> It is well settled that title to property of the United States cannot be divested by negligence, delay, laches, mistake, or unauthorized actions by subordinate officials.

*Id.* at 1098.

Relying on *United States v. California,* 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889, 1947 AMC 1579, 1595 (1947), the Court held that neither the maritime nor common law doctrine of abandonment was applicable to that case.

> While this traditionally conceived doctrine might prove dispositive of the factual questions in this case if it concerned a dispute between private citizens,

> > [T]he Government which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of government property cannot by their conduct cause the Government to lose its valu-

able rights by their acquiescence, laches, or failure to act. *United States v. California*, 332 U.S. 19, 40 [67 S.Ct. 1658, 1669, 91 L.Ed. 1889], 1947 AMC 1579, 1595 (1947).

1984 AMC at 1098.

The Court determined that the HATTERAS wreck came under the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471, *et seq.* and that it was "foreign excess property" within the meaning of 40 U.S.C. § 512.

> Implicit in the statutory scheme of 40 U.S.Code, Section 512, is the requirement that, prior to any agency action, a determination be made whether the property proposed to be abandoned has any commercial value and, if so, whether the estimated cost of care and handling would exceed the estimated proceeds from its sale.

1984 AMC at 1100.

■ The United States has never formally abandoned the wreck of CSS ALABAMA. It is, therefore, in all respects similar to USS HATTERAS. It is a sunken wreck located in non-territorial waters. In view of this, the wreck, and by extension, the ship's bell, remain the property of the United States.

■ Moreover, the claim of the United States to title and ownership of the bell of CSS ALABAMA and its right to possess it are consistent with International Law regarding warships sunk during armed conflict. It is the position of the United States Department of State that warships and their remains which are clearly identifiable as to the flag State of origin are clothed with sovereign immunity and therefore entitled to a presumption against abandonment of title. *Digest of United States Practice in International Law*, pp. 999–1006 (Dept. of State 1980).

After an extensive analysis of treaty law, commentaries, United States caselaw and foreign caselaw (See particularly pp. 1004–1005), the State Department concluded:

> Consequently, it is clear that under well-established State practice, States generally do not lose legal title over sunken

warships through the mere passage of time in the absence of abandonment. They do not lose title during combat in the absence of an actual capture of the warships. Although abandonment may be implied under some circumstances, United States warships that were sunk during military hostilities are presumed not to be abandoned and are considered not subject to salvage in the absence of express consent from the United States Government.

*Id.* at 1005.

Moreover, the legislative history of the Abandoned Shipwreck Act of 1987, 43 U.S.C. §§ 2101–2106, effective April 28, 1988 supports the view of the State Department. House Report 100–514(I) (p. 366), U.S.Code Cong. & Admin.News 365–385. The House Committee noted at pp. 366–68:

> the United States only abandons its sovereignty over, and title to, sunken U.S. warships by affirmative act. Passage of time or lack of positive assertions of rights are insufficient to establish such abandonment.

Later, in part II at page 374, discussing abandonment in general, warships are again excluded thusly:

> *Except in the case of U.S. Warships or other public vessels (which requires an affirmative act of abandonment)*, the act of abandonment may be implied from the circumstances of the shipwreck.... [Emphasis supplied].

Clearly, warships are to be treated uniquely.

Thus, the lapse of time between the sinking of CSS ALABAMA and Mr. Steinmetz's acquisition of the ship's bell did not result in abandonment or the United States' loss of title to the ship and its equipment.

D. *The Counterclaim.* Mr. Steinmetz, by way of counterclaim, seeks the following alternative relief: a determination (1) that the bell is his property and that he is entitled to be paid its market value; (2) that he is otherwise entitled to compensation on a theory of *quantum meruit;* and (3) that he is entitled to compensation on the theory that the United States would be otherwise unjustly enriched.

To the extent that Mr. Steinmetz's first claim interposes his own claim of ownership in derogation of the claim of the United States, he may properly assert it. For the reasons set forth above, however, I have concluded that Mr. Steinmetz's claim to ownership cannot be sustained.

■ I lack jurisdiction to entertain Mr. Steinmetz's second and third claims seeking compensation from the United States based on the theories of *quantum meruit* and unjust enrichment. Affirmative relief is sought without a showing that the United States has waived its sovereign immunity.

In *United States v. Gregory Park, Section II, Inc.*, 373 F.Supp. 317 (D.N.J.1974), the Court held with respect to counterclaims against the United States:

> [T]he institution of suit by the United States [does not] comprise an implied waiver of sovereign immunity to afford affirmative relief. A specific waiver is required. (Citations omitted). Such provisions are not diluted by Fed.R.Civ.P. 13 permitting counterclaims to come within the court's ancillary jurisdiction, as Rule 13(d) specifically provides:
>
>> *Counterclaim Against the United States.* These rules shall not enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof.
>
> However, notwithstanding plaintiff's sovereign immunity and Rule 13(d), defendant may assert a claim arising out of the same transaction or occurrence as the original claim *by way of recoupment to reduce or defeat the Government's recovery.* But such bases will not permit an affirmative recovery, which still re-

quires an independent waiver of immunity. (Citations omitted) (Emphasis supplied).

*Id.* at 351. *See also Frederick v. United States*, 386 F.2d 481 (5th Cir.1967) and *United States v. Timmons*, 672 F.2d 1373 (11th Cir.1982).

In the instant action, the United States seeks a declaration of its title and ownership of the ship's bell of CSS ALABAMA and possession of the bell. Mr. Steinmetz in his first counterclaim seeks analogous relief. However, in his second and third counterclaims, he seeks affirmative relief against the United States in the form of monetary compensation without setting forth a statutory predicate of waiver of immunity which would permit him to receive such compensation. The Court, therefore, lacks jurisdiction to entertain Mr. Steinmetz's second and third counterclaims.

For these reasons, the United States is entitled to summary judgment on Mr. Steinmetz's first counterclaim and to a judgment of dismissal of his second and third counterclaims.

For the foregoing reasons the United States' motion for summary judgment must be granted and Mr. Steinmetz's motion for summary judgment must be denied. The United States is entitled to ownership and possession of the bell. I shall prepare and file an appropriate order.[2]

---

**2.** I expressed my view at the hearing that fairness and equity suggest that, regardless of the legal merits of the case, the United States should at least reimburse Mr. Steinmetz for his expenses in acquiring, shipping and preserving the bell, since through these efforts the bell has been returned to the American people.

The Navy notes that a sunken naval vessel is not only a repository of our nation's naval heritage, it is also a sacred place, a watery grave containing the bodies of the officers and men who went down with their ship. These vessels,

though government property, are subject to disturbance from both amateur and professional divers and from fortune and souvenir hunters. To discourage this kind of desecration and to preserve these vessels for historical and public use, the Navy, as a matter of policy, refuses to pay for artifacts taken from its sunken vessels.

The Navy's concerns are both understandable and laudable. One would think, however, that in the unusual circumstances of this case some way could have been devised to make Mr. Steinmetz whole. But that, apparently, was more than the bureaucratic mind could accomplish.