**UNITED STATES of America**

v.

**Richard STEINMETZ, Appellant.**

**No. 91–5582.**

United States Court of Appeals,
Third Circuit.

Argued April 7, 1992.

Decided Aug. 21, 1992.

Rehearing Denied Sept. 18, 1992.

---

Peter E. Hess (argued), Wilmington, Del., David J. Bederman (argued), Emory University School of Law, Atlanta, Ga., for appellant.

Stuart M. Gerson, Asst. Atty. Gen., Michael Chertoff, U.S. Atty., Janis G. Schulmeisters, Mark E. Schaefer (argued), U.S. Dept. of Justice, New York City, for appellee.

Paul N. Keller, Park Ridge, Ill., for amicus-appellants American Sport Divers Assn., Federation of Metal Detector & Archeological Clubs, Alliance for Maritime Heritage Conservation, International Scuba Ass'n, Eastern Dive Boat Ass'n, and North–South Trader Civil War Magazine.

David A. Doheny, Gen. Counsel, Thompson M. Mayes, Asst. Gen. Counsel, Elizabeth S. Merritt, Paul W. Edmondson, National Trust for Historic Preservation, Washington, D.C., for amicus-appellees National Trust for Historic Preservation in the U.S., Society of Professional Archeologists, Society for Historical Archaeology, Advisory Council on Underwater Archaeology, Society for American Archaeology and Council of American Maritime Museums.

Before: SLOVITER, Chief Judge, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

The circumstances out of which this appeal arises are more suited to an epic poem

than a legal opinion. They include a marauding vessel of the Confederacy, a Union man-of-war secretly outfitted with iron chain mail covering its hull concealed by planking, a maritime duel challenged and accepted, combat between the vessels in international waters off the coasts of England and France, the white flag of surrender, the sinking of the Confederate ship to its watery grave, the escape of its captain, the recovery of its bell by a British diver 72 years later, and the bell's odyssey [1] spanning from a local pub, through World War II bombing and a succession of antique dealers, to its temporary docking on the floor of a federal courtroom in New Jersey, and its current display at the Naval Historical Center at the Washington D.C. Navy Yard.

We will never know all of the historical facts of the naval battle. The eyewitnesses are no longer alive, and we are left with the possibility that their written accounts are skewed by unspent passions. However tempting the incursion into the detours of unanswered historical questions, we are convened for another purpose. The legal issue presented is whether the bell from the C.S.S. ALABAMA, a Confederate commerce raider sunk by the Union Navy off the coast of Cherbourg, France in 1864, is the property of the United States, either by right of succession or by right of capture. Appellant Richard Steinmetz bought the bell in England in 1979 and brought it back to the United States. When he put it up for auction in 1990, the United States Navy claimed that the bell was its property. The district court agreed with the Navy and Steinmetz appeals.

I.

*Facts* [2]

In 1861, Captain James D. Bulloch, an agent of the Confederate Navy, went to Liverpool, England to contract for warships. His task was complicated by Britain's neutrality, proclaimed by Queen Victoria in May 1861, and its Foreign Enlistment Act of 1819, which forbade the construction and arming of warships in British territory for a belligerent power. The British circumvented these requirements by allowing private parties to build ships but not arm them. For example, despite the efforts of Thomas S. Dudley, the United States Consul in Liverpool, the Confederate cruiser FLORIDA departed from Liverpool in March of 1862 only to be armed later with weapons shipped out separately.

In July 1862, the steamship ALABAMA, despite similar attempts to detain her, also departed from Liverpool and proceeded to the Azores, where she picked up guns and ammunition. In August 1862, she was put into commission as a Confederate cruiser by Captain Raphael Semmes, a native of the state of Alabama and a former officer in the United States Navy who had resigned to join the Confederate Navy soon after Alabama seceded from the Union. Semmes and the ALABAMA roamed the Atlantic Ocean, the Gulf Coast, the African Cape, and the China Sea for two years destroying or capturing at least 62 American merchant and whaling ships. According to one source, the work of the Confederate cruisers and privateers, in addition to their effect on individual ships, raised insurance rates, caused hundreds of American vessels to fly under the British flag to avoid capture, and generally "gave the American merchant marine a setback from which it did not recover till the time of the first World War." J.G. Randall & David Donald, *The Civil War and Reconstruction* 451 (2d ed. 1969).

In June 1864, while the ALABAMA was docked in Cherbourg, France for repairs,

---

**1.** In contrast, Odysseus spent merely ten years fighting the Trojans and ten years fighting assorted other dangers and temptations until his return to Ithaca. *See The Odyssey of Homer* (Richmond Lattimore trans. 1967).

**2.** The nature of this dispute requires us to consult historical documents included in the parties' appendices and admitted into evidence pursuant to Fed.R.Evid. 803(16) (hearsay exception for statements in ancient documents), historical texts cited by the parties in their briefs or relied on by the district court, and a standard reference work, 2 Alexander H. Stephens, *A Constitutional View of the Late War between the States* (1870), because it contains direct quotations from original sources and provides a contemporaneous view.

Captain Semmes learned that the U.S.S. KEARSARGE, a Union ship under the command of Captain John Winslow,[3] was positioned in international waters outside the harbor of Cherbourg. On June 19, 1864, the ALABAMA went to sea to meet the KEARSARGE, accompanied by the DEERHOUND, an English yacht out on a leisure cruise, and under the gaze of crowds of people who came from as far as Paris and lined the harbor to watch the battle.[4] After a little over an hour, the ALABAMA, having been badly hit and sinking fast, struck its colors and ran up a white flag. Semmes sent an officer in a boat to the KEARSARGE to request assistance saving the men from their sinking ship. After boats of wounded were sent to the KEARSARGE, Captain Semmes and the rest of the surviving crew jumped overboard just before the ALABAMA sank. Some of the crew were picked up by the KEARSARGE and taken as prisoners, but many crewmen died. Captain Semmes along with the remainder of his officers and crew were picked up by the DEERHOUND and taken to England, where they were set free.

The exploits of the ALABAMA and other Confederate raiders were the subject of an international dispute between the United States and England which became known as the "Alabama Claims." After the war, the United States sought indemnity from England for the havoc wreaked upon its interests by the Confederate warships that were built, outfitted, and generally assisted by the English. These claims were settled by an international arbitration tribunal, convened pursuant to the Treaty of Washington of 1871, that met in Geneva and awarded $15.5 million to be paid by Great Britain to the United States. *See* Randall & Donald, *The Civil War and Reconstruction* 671–77.

In 1936, William Lawson, a British diver from the Isle of Guernsey, retrieved the brass bell from the ALABAMA, inscribed with the letters "C.S.S. Alabama,"[5] and sold it to a local bar, apparently for drinking privileges. App. at 88. That bar was destroyed by British bombing during World War II, Guernsey having fallen into German hands. The bell was dug out of the rubble after the war and exchanged hands until it wound up with an antique dealer in Hastings, England. In 1979, appellant Steinmetz, a New Jersey resident and an antique dealer for 40 years, heard about the bell while at an antique gun show in London. Steinmetz flew to Guernsey, spent a week and a half researching its authenticity, and then purchased the bell by trading approximately $12,000 worth of antique guns and pistols.

Steinmetz took the bell back to his home in Westwood, New Jersey. Within a week after his arrival back in the United States, he offered to sell or trade the bell to the United States Naval Academy. The Academy apparently wanted to display the bell but would not purchase it, so Steinmetz put it on his shelf for 11 years.

In December 1990, Steinmetz put the bell up for auction with the Harmer Rooke Galleries in New York. After the Naval Historical Center learned of the auction, the United States claimed that the bell was its property, and filed a complaint in admiralty in the United States District Court in New Jersey and a motion to show cause why Steinmetz should not deliver the bell to the United States. In response, Steinmetz delivered the bell to the district court, and filed an answer and counterclaim for a determination that the bell was his property, for payment of full market value for the bell or, in the alternative, compensation under the theories of *quantum meruit* and/or unjust enrichment on

---

3. Coincidentally, Semmes and Winslow were cabinmates when they served together in the United States Navy during the war with Mexico.

4. The battle has also been celebrated in the fine arts. Édouard Manet's famous painting of the battle is in the permanent collection of the Philadelphia Museum of Art.

5. Steinmetz suggested that this inscription was hand cut rather than cast because there were Union agents in the bell foundries in England, on the lookout for equipment being built for the Confederacy. App. at 91.

the part of the United States. After a hearing [6] in the district court on the motion to show cause, both parties moved for summary judgment.

The district court granted the United States' motion for summary judgment, finding in the government's favor on both theories put forth by it. *United States v. Steinmetz*, 763 F.Supp. 1293 (D.N.J.1991). The court found that the ALABAMA had been captured by the KEARSARGE and therefore became United States property at the time of the battle in 1864. *Id.* at 1298. In the alternative, the court found that because the United States succeeded to the public property of the Confederacy after the Civil War, the ALABAMA became the property of the United States when the war was over. *Id.*

The court also found that by virtue of Article IV, Section 3, Clause 2 of the United States Constitution and statutory law, the United States did not abandon the ship because no congressionally authorized person formally abandoned the wreck of the ALABAMA. *Id.* at 1299. Finally the district court found that it lacked jurisdiction to hear Steinmetz's counterclaims seeking compensation for the bell on the theories of *quantum meruit* and unjust enrichment because the United States had not affirmatively waived its immunity to such claims. *Id.* at 1300. Steinmetz does not appeal the counterclaim issue, since he does not assert it in his brief. *See* Fed.R.App.P. 28(a).[7]

Although the district court granted summary judgment, a procedure that does not contemplate oral testimony, the court based its judgment in part on the earlier testimony of Naval Historian William S. Dudley and Steinmetz given in connection with the court's order to Steinmetz to show cause why he should not deliver the bell to the United States.

We have in the past, when faced with a similar situation, determined that if there was no additional evidence presented to the trial court that would aid the adjudication of the case, we would review the court's findings of fact under a "clearly erroneous" standard. *See Donovan v. DialAmerica Mktg.*, 757 F.2d 1376, 1382 (3d Cir.), *cert. denied*, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). This would be awkward here because there were some disputed issues of fact presented to the district court, particularly concerning the capture issue, which the district court resolved after taking testimony. Because we do not decide the capture issue, those disputed facts are essentially irrelevant and we rely for our disposition only on the undisputed facts upon which the court based its summary judgment. It is the legal conclusions reached by the trial court that are at issue and they are subject to plenary review.

---

**6.** There was yet an additional unexpected twist to the saga of the bell. Coincidentally, one of the district judges of New Jersey, John Winslow Bissell, is a descendant of the KEARSARGE's Captain Winslow. On the date fixed for the hearing on the order to show cause, there was a ceremony attended by school children at which Judge Bissell participated and recounted the history of the bell, reading primarily from the account of the ALABAMA's executive officer, Lieutenant Kell. Steinmetz contends that Judge Bissell's "testimony" may have unfairly influenced the district court into ruling that the ALABAMA had been captured by the KEARSARGE.

It is unlikely that the parties present deemed Judge Bissell's presentation to have been "testimony." He did not appear to have been sworn in and he apparently left after his presentation. App. at 42. Had he in fact testified it might have raised questions of the appearance of impropriety. It is evident that the district court did not regard the ceremony, designed to excite the interest of 6th graders in one phase of American history, as part of the case record because the court stated, after thanking its colleague Judge Bissell, "[w]e will now proceed with the more formal part of the case. We'll start with the evidence which the government may wish to put on the record." App. at 42. In any event, we do not reach the issue of capture in our disposition of this case, and thus any possible influence arising out of Judge Bissell's participation must necessarily be harmless.

**7.** This court's request that the parties brief the question whether Steinmetz should have asserted his claim for *quantum meruit* and/or unjust enrichment in the Claims Court does not relieve Steinmetz from the effect of his failure to preserve the issue. *Winston v. Children & Youth Servs.*, 948 F.2d 1380, 1385 (3d Cir.1991).

## II.

### Discussion

The legal issues raised by this case appear to be of substantial interest to numerous persons beyond the United States and Steinmetz. Thus, we have received a brief from *Amici Curiae* American Sport Divers Association, Federation of Metal Detector & Archeological Clubs, Alliance for Maritime Heritage Conservation, International Scuba Association, Eastern Dive Boat Association, and North–South Trader Civil War Magazine, who represent "thousands of individuals who, either as a hobby or as a business, have a financial interest in Confederate military equipment, and other historically significant military artifacts," and who argue that their potential loss of ownership rights to these artifacts to the government under the theory of succession "would have a significant 'chilling effect' on their efforts to expand our knowledge of Civil War history through discovery and preservation of its physical relics."

Arrayed against them are *Amici Curiae* National Trust for Historic Preservation in the United States, Society of Professional Archeologists, Society for Historical Archaeology, Advisory Council on Underwater Archaeology, Society for American Archaeology and Council of American Maritime Museums. These *Amici* argue that "[r]ecognition of United States ownership of Confederate property.... will ensure that the United States maintains the right and ability to protect and preserve historic artifacts and archaeological artifacts ... which would otherwise be subject to damage or loss through inappropriate retrieval and disposition," and will remove the economic incentives for individuals to remove artifacts from their historical contexts for personal financial gain. We cannot base a ruling on either of these grounds which are more appropriately directed to Congress than to a court. Instead, we must attempt to steer our course on the basis of legal doctrine applied to the known historic facts.

## A.

### Capture

In support of his argument that the district court erred in holding that the government is entitled to the ALABAMA's bell by virtue of capture, Steinmetz argues that the prerequisites for establishing that the KEARSARGE captured the ALABAMA were not satisfied. It is uncontroverted that the ALABAMA, despite its having struck its colors and raised the white flag of surrender, never came within the physical possession of the KEARSARGE. Indeed, Semmes wrote that cannons were fired from the KEARSARGE even after the ALABAMA's intention to surrender was communicated. *See* Admiral Raphael Semmes, CSN, *Memoirs of Service Afloat During the War Between the States* 757 (The Blue & Grey Press 1987). In any event, the ship sank before the KEARSARGE could exercise any control over it.

The district court, apparently in recognition of the absence of a factual basis to support the traditional view of capture, stated that before the ALABAMA sank, the KEARSARGE was "positioned across ALABAMA's bow thwarting escape and able to deliver unanswerable raking fire," thereby establishing it was in the "constructive possession" of the ALABAMA.[8] *Steinmetz*, 763 F.Supp. at 1298. Steinmetz argues that such a doctrine has never been accepted in law. The government responds by citing to an allusion to constructive possession in the early decision of *The Alexander*, 1 F.Cas. 357, 360 (C.C.D.Mass.1813) (No. 164), *aff'd*, 12 U.S. (8 Cranch) 169, 3 L.Ed. 524 (1814). No case has been cited that based a decision on constructive possession without there having been some actual control over the "captured" ship's movements by the captor. However, we need not decide the viability of a constructive capture doctrine on this appeal, because we conclude that there is ample basis to support the judgment of the district

---

**8.** Captain Semmes maintained that the KEARSARGE never came within 400 yards of the ALABAMA. Semmes, *Memoirs* 759.

court on its alternative theory of succession. This permits us to avoid the conundrum presented by the differing accounts of the battle from long-since-unavailable eyewitnesses.

## B.

### *Succession*

In his argument that the district court erred in holding that the United States succeeded to the ownership of the ALABAMA as the successor to the property of the Confederacy, Steinmetz offers two theories. First he argues that inasmuch as the law of succession only applies to public property, the United States could not succeed to the ownership of the ALABAMA because it was not owned by the Confederacy but was privately owned as a pirate ship. Alternatively, Steinmetz contends that even if the ALABAMA was the property of the Confederacy, the United States never adopted the succession doctrine as it was understood in international law and, to the extent that it did, it would have been required to perfect its title to the ALABAMA long ago.

### 1. *Pirate Ship*

■ Steinmetz concedes that the *de facto* government of the Confederacy could acquire title to real and personal property, a principle established in Supreme Court cases. *See, e.g., Whitfield v. United States*, 92 U.S. 165, 166, 23 L.Ed. 705 (1876) ("[w]e have thus decided that the Confederate States Government could acquire title to real property by purchase; and it is not easy to see why a different rule should be applied to personal property"). Steinmetz's argument that the ALABAMA was not public property is really based on a form of estoppel: during the war, Union officials described the ALABAMA and its crew as "pirates" and therefore the United States cannot now claim that the Alabama was publicly owned.

Historical materials do show that the Confederate privateers and commerce raiders were referred to as "pirates." In announcing the Union blockade of the South on April 19, 1861, President Lincoln threatened to punish under the laws relating to piracy those acting under the "pretended authority" of the Confederacy who "molest a vessel of the United States." 12 Stat. 1258, 1259 (1861). The Secretary of the Navy, Gideon Welles, in a dispatch to Captain Winslow after the sinking of the ALABAMA, made reference to the prisoners taken by Winslow as "foreign pirates." App. at 152.

There were even trials of Confederate privateers for piracy. For example, in 1861, members of the Confederate schooner SAVANNAH went on trial for piracy in federal court in New York, but the trial ended in a hung jury and the defendants were eventually exchanged as prisoners of war. *See* John D. Gordan, III, The Trial of the Officers and Crew of the Schooner "Savannah", 1983 Yearbook–Supreme Court Historical Society 31; Trial of the Officers and Crew of the Schooner Savannah, on the Charge of Piracy, United States Circuit Court for the Southern District of New York, October 23, 1861 (trial transcript). This incident gave rise to a letter, dated Richmond, July 6, 1861, written to President Lincoln from Jefferson Davis, threatening that,

> "this Government will deal out to the prisoners held by it, the same treatment and the same fate as shall be experienced by those captured on the Savannah; and if driven to the terrible necessity of retaliation, by your execution of any of the officers or crew of the Savannah, that retaliation will be extended so far as shall be requisite to secure the abandonment of a practice unknown to the warfare of civilized man, and so barbarous, as to disgrace the nation which shall be guilty of inaugurating it."

2 Alexander H. Stephens, *A Constitutional View of the Late War Between the States* 432–33 (1870) [hereinafter Stephens, *A Constitutional View*] (quoting letter of Jefferson Davis).

Nevertheless, all of the historical evidence suggests that the references to piracy were more rhetorical than legal. The Confederacy was recognized by the United States as possessing "belligerent rights," *Williams v. Bruffy*, 96 U.S. 176, 186–87, 24

L.Ed. 716 (1878) (captives treated as prisoners of war, exchange of prisoners, recognition of flags of truce, and "other arrangements having a tendency to mitigate the evils of the contest"); 1 John Bassett Moore, *A Digest of International Law* 184–86 (1906) [hereinafter Moore, *International Law* ] (noting recognition of belligerency by England, France, Spain, the Netherlands, and Brazil), There is every indication that the ALABAMA sailed under the Confederate flag. *See United States v. Smith*, 27 F.Cas. 1134, 1135 (C.C.E.D.Pa. 1861) (No. 16318) (defining piracy as " 'depredation on or near the sea without authority from any prince or state' ").

Death was the recognized penalty for piracy yet no Confederate was ever executed for the crime. Those suspected and/or convicted of piracy during the war were either released or treated as prisoners of war. *See* J.G. Randall, *Constitutional Problems Under Lincoln* 66 (University of Illinois Press 1951) [hereinafter Randall, *Constitutional Problems*]; 2 Moore, *International Law* 1079 (noting *Smith*, 27 F.Cas. at 1134, in which convicted prisoners were delivered to military custody); 2 Stephens, *A Constitutional View* 434 ("Whether the authorities at Washington were induced to change their policy and purpose in this particular, by a recognition of the laws of war, or from a sense of humanity, or from fears excited in another quarter, will, perhaps, be left forever to conjecture; for no explanation of it has ever been given to the public, as far as I am aware.").

In fact, there appears to have been a conscious decision not to prosecute Captain Semmes for piracy after the war. In August, 1872, Bolles, the Solicitor of the Navy Department, discussed this issue in the *Atlantic Monthly*, stating:

"By establishing a blockade of Confederate ports, our Government had recognized the Confederates as belligerents, if not as a belligerent state, and had thus confessed that Confederate officers and men, military or naval, could not be treated as pirates or guerrillas, so long as they obeyed the laws of war."

2 Moore, *International Law* 1082–83 (quoting *Atlantic Monthly* for July & Aug. 1872).

The discrepancy between what the Union said and what it did with regard to the piracy issue has been summarized by one historian as follows:

[F]rom every standpoint it was found impolitic and indeed impossible to carry out this policy of punishing for piracy those who were in the Confederate service. It is thoroughly recognized in international law that those who operate at sea under the authority of an organized responsible government observing the rules of war may not be treated as pirates. Internationally, the Confederacy was a recognized belligerent, and to have its ships deemed piratical under the *jus gentium* was entirely out of the question. To treat them as pirates under the municipal law was practically equivalent to treating them as traitors.... Besides, when it became known that Southern privateersmen were being held for piracy, retaliation was at once threatened, and certain Union captives were selected as hostages, on whom the Richmond Government intended to retaliate in case the Federals should actually prosecute the piracy charge.

Randall, *Constitutional Problems* 65–66 (footnote omitted).

There was ample evidence in the record that the ALABAMA was owned by the Confederacy. All accounts of the ALABAMA presented to the district court stated that the ALABAMA was built in Liverpool under contract with the Confederacy. *See Steinmetz*, 763 F.Supp. at 1294; App. at 89 (Steinmetz's testimony). There was no evidence presented that the Confederacy transferred ownership of the ALABAMA to its crew, or that Captain Semmes or a member of his crew paid for the ALABAMA or captured it from the Confederacy.

▮ Without some facts to contradict the clear evidence that the Confederacy owned the ALABAMA and that Captain Semmes, although obviously given considerable autonomy on the high seas, was

understood by the United States and the Confederate government to be an agent of the Confederacy, there is no material question of fact as to whether the Confederacy owned the ALABAMA when it sank in 1864. Thus, we conclude that the ALABAMA was not a piratical vessel.

### 2. *Property of the Confederacy*

■ Having established that the Confederacy owned the ALABAMA, we are faced with the question whether the United States succeeded to its ownership after the Civil War.

State succession is not a well-defined legal doctrine. One commentator, noting the different treatment given to the law of state succession by different writers, has suggested that it be treated in "specialized contexts" because the "concepts of 'succession' and 'continuity' of states ... are levels of abstraction unfitted to deal with specific issues." *See* Ian Brownlie, *Principles of Public International Law* 635 (1966).

*Amici Curiae* American Sport Divers Association, *et al.* contend that succession can only occur between sovereign governments, and that the recognition of the Confederacy as a belligerent did not amount to recognition of it as a sovereign. They cite the following:

> The transfer of territory from one State to another takes place in at least five ways, namely, (a) cession, (b) annexation, (c) emancipation, (d) formation of a union, and (e) federation. The common factor in all five situations is that one sovereign substitutes itself for another.

1 D.P. O'Connell, *International Law* 365 (2d ed.1970) (footnote omitted).

This definition of succession is not exclusive, however. O'Connell makes a distinction between succession of states and succession of governments. *See id.* at 394 ("the property acquired by rival political organisations is attributed to the State to whose government they pretend, so that the assets of the defeated may be claimed by the victor but subject to the liabilities of the defeated respecting it" (footnote omitted)); *see also* Charles G. Fenwick, *International Law* 172 (4th ed. 1965).

■ The Supreme Court has stated both that after the Civil War the public property of the Confederacy passed to the United States and that the United States did not have to physically possess the property in order to have succeeded to its ownership. In *Williams v. Bruffy,* the Court stated:

> [The Confederacy] claimed to represent an independent nation and to possess sovereign powers; and as such to displace the jurisdiction and authority of the United States from nearly half of their territory and, instead of their laws, to substitute and enforce those of its own enactment. Its pretensions being resisted, they were submitted to the arbitrament of war. In that contest the Confederacy failed; and in its failure its pretensions were dissipated, its armies scattered, and the whole fabric of its government broken in pieces. *The very property it had amassed passed to the nation.* The United States, during the whole contest, never for one moment renounced their claim to supreme jurisdiction over the whole country....

96 U.S. at 188 (emphasis added).

■ In *United States v. Huckabee,* 83 U.S. (16 Wall.) 414, 21 L.Ed. 457 (1873), the Court found it had no jurisdiction to entertain a claim by Huckabee who had sold his iron works company to the Confederacy. The property was captured by Union forces in 1865 and then sold to Lyon soon thereafter. The Court found it lacked jurisdiction for a number of reasons, one of which was that Lyon's title was valid because it was acquired from the United States which had captured the iron works. The Court then elaborated on this point, stating that "as the confederation having been utterly destroyed no treaty of peace was or could be made," and that "if the nation is entirely subdued, or in case it be destroyed and ceases to exist ... [the rights of the conqueror] are no longer limited to mere occupation of what he has taken into his actual possession, but *they extend to all the property and rights of the conquered state,* including even debts as well as personal and real property." *Id.* at 434–45 (emphasis added).

In *Leathers v. Salvor Wrecking Co.*, 15 F.Cas. 116 (C.C.S.D.Miss.1875) (No. 8164), the United States had contracted with a salvage company to salvage the steamer Natchez, a private boat used by the Confederate government which was burnt and sunk during the war. The court determined that since the Confederacy had fully compensated the owner for the boat, the United States became its rightful owner after the war:

> If the steamer Natchez was impressed into the service of the Confederate States government, and was burnt and sunk whilst in that service, and if full compensation for the vessel's loss was paid to the libelant by that government, the property of the wreck thereafter belonged to it; and at the close of the war, became the property of the government of the United States, which thereupon acquired a right to dispose of the wreck as it saw fit.

*Id.*

The English courts took a similar view. Thus, for example, in *United States v. McRae*, 8 L.R.–Eq. 69 (Court of Chancery 1869), the United States claimed ownership to goods and money held by McRae, an agent of the Confederacy who had been an intermediary in England for the sale of Confederate goods. McRae claimed that he was owed money by the Confederacy but the United States refused to agree to settle with McRae upon receiving the goods. The court held that without such an agreement, the United States could not succeed to the Confederate property in McRae's possession. The court stated:

> [T]his right is the right of succession, is the right of representation, is a right not paramount, but derived, I will not say under, but through, the suppressed and displaced authority, and can only be enforced in the same way, and to the same extent, and subject to the same correlative obligations and rights as if that authority had not been suppressed and displaced and was itself seeking to enforce it.

*Id. see also United States v. Prioleau*, 35 L.J. Chancery N.S. 7, 11 (1865) (cotton owned by the Confederacy with a lien held by members of an English firm is property of the United States, subject to all the conditions and liabilities to which the property is subject).

Steinmetz and the *Amici* contend that the succession doctrine is inapplicable to the Confederacy's property because under that doctrine the successor government taking the assets of the conquered government must also take on its debts, which the United States did not do with respect to the Confederacy. Indeed, section 4 of the Fourteenth Amendment explicitly provides:

> [N]either the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, ... but all such debts, obligations and claims shall be held illegal and void.

U.S. Const. amend. XIV, § 4.

As Steinmetz notes, the English courts that addressed this issue assumed that when the United States succeeded to the property of the Confederacy, it also succeeded to the debts and obligations attached to that property. Thus, those courts would not allow the United States to succeed to Confederate property without assuming the outstanding obligations as to that property. *See McRae*, 8 L.R.–Eq. at 69; *Prioleau*, 35 L.J. Chancery N.S. at 11. We are unable to find a United States case that so held. But even the English courts did not interpret the succession doctrine to require the United States to succeed to the Confederacy's debts unrelated to the particular property at issue.

Even though there may be some question as to the exact contours of the succession doctrine as applied by the United States after the Civil War, in the case of the ALABAMA there were no outstanding liabilities for which the United States might have been responsible had it asserted its title to the ALABAMA right after the war. Steinmetz does not allege that the ALABAMA was not fully paid for by the Confederacy.

It follows that whether or not historians would regard the international law of suc-

cession as applicable here,[9] the succession doctrine, as explicated and applied by the United States Supreme Court with respect to the Civil War, entitled the United States to all property acquired by the Confederacy. Therefore, we hold that, as a matter of law, the United States acquired title to the ALABAMA after the Civil War ended.

### 3. *Abandonment*

Steinmetz offers one final argument to defeat the United States' claim that it owns the ALABAMA's bell. He claims that even if the United States did succeed to ownership of the ALABAMA after the war, the United States abandoned the ship in the depths of the briny sea because it never asserted ownership of it and never showed any interest in its salvage.[10]

Article IV, Section 3, Clause 2 of the Constitution states:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

This clause has been interpreted to mean that the United States cannot abandon its own property except by explicit acts. As the Court stated in *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947):

> The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.

*Id.* at 40. *See generally* 91 C.J.S. *United States* §§ 75–76 (1955).

■ Steinmetz correctly points out that the policy of the United States concerning abandonment of its sunken vessels has not always been consistent. In recent times, a Deputy Legal Adviser of the Department of State has recognized the practice of treating warships from the 17th and 18th centuries as abandoned by implication of the long passage of time, but has taken the position that with respect to U.S. warships of the 19th and 20th centuries, that " 'it should be presumed that title to such vessels remains in the U.S.' " Marian Nash Leich, Digest of United States Practice in International Law 1004 (1980) (quoting Legal Adviser's Memorandum). The same document concluded that "[a]lthough abandonment may be implied under some circumstances, United States warships that were sunk during military hostilities are presumed not to be abandoned and are considered not subject to salvage in the absence of express consent from the United States Government." *Id.* at 1005.[11] It is clear that vessels sunk during the Civil War are covered by the policy asserting United States title to them.

---

**9.** Randall makes the argument that it is inappropriate to consider the United States' actions after the war as acts of a successor *per se:*

> [T]o argue that the United States should have taken over the Confederate debt would be to assume that the Confederate States had existed before the war as an established international person, and had then been conquered and absorbed by the United States. Even then, prevailing international practice would have suggested that Confederate debts incurred for the war itself should not be assumed.... The defeat of such a rival government did not amount to the overthrow or absorption of an existing 'state' in the international sense. As to the principle of state-continuity, it was preserved in the fact that the United States was not supplanted in its control over the South.

Randall, *Constitutional Problems* 238 n. 51.

**10.** Abandonment is defined as the "surrender, relinquishment, disclaimer, or cession of property or of rights. Voluntary relinquishment of all rights, title, claim and possession, with the intention of not reclaiming it." Black's Law Dictionary 2 (5th ed. 1979).

**11.** This policy stems not only from concern about preservation of American history but from sensitivity to the fact that wrecks of warships "are the watery graves of American war dead." Brief for Appellee at 7.

In *Hatteras, Inc. v. The U.S.S. Hatteras*, 1984 A.M.C. 1094 (S.D.Tex.), *vacated in part on other grounds*, 1984 A.M.C. 1102 (S.D.Tex.1981), the court held that the U.S.S. HATTERAS, which was sunk by the ALABAMA in 1863 in international waters south of Galveston, Texas, remained the property of the United States despite over one hundred years of neglect. The court distinguished abandoned public property from private property, noting that although an inference of abandonment can sometimes be made from non-use of private property, property of the United States can only be abandoned as authorized by Congress. *Id.* at 1098; *cf. United States v. Pennsylvania & Lake Erie Dock Co.*, 272 F. 839, 843 (6th Cir.1921) (distinguishing abandonment by the United States of temporary easement, which is possible without an Act of Congress, from abandonment of property whose title the government has acquired, which is not).[12]

We find unpersuasive Steinmetz's attempt to distinguish *Hatteras* on the ground that that ship was in international waters whereas the ALABAMA, which was originally in international waters, is now in French waters because France extended its territorial seas in 1971. The bell was taken from the wreck before France extended its territory. *See* J. Ashley Roach, France Concedes United States Has Title to the CSS ALABAMA, 85 Am.J.Int'l L. 381, 382 n. 2 (1991). Thus, there is no basis for Steinmetz's abandonment theory.[13]

## III.

### Conclusion

We conclude that as a matter of law the ALABAMA's bell is the property of the United States by right of succession and that the district court was correct in so holding. It is not lost on us that this leaves uncompensated Steinmetz's considerable energy and creativity in retrieving and returning to the United States an irreplaceable artifact from its history. The district court noted that "[o]ne would think ... that in the unusual circumstances of this case some way could have been devised to make Mr. Steinmetz whole. But that, apparently was more than the bureaucratic mind could accomplish." *Steinmetz*, 763 F.Supp. at 1300 n. 2. It may be that the United States' position to deny compensation even to those whose title traces from the original diver rather than their own expedition is in line with its policy "to discourage disturbing these wrecks except for professional, non-invasive archeological research." Brief for Appellee at 7.[14]

Steinmetz, of course, is free to present his case to a sympathetic congressional representative who may introduce a private bill. As we noted at the outset, our function is to decide the law, and thus decide for whom the ALABAMA's bell tolls after 128 years: it tolls for the United States.

---

**12.** As to the legal status of the ALABAMA between its sinking and the Union's victory, some question could be raised as to whether the Confederacy abandoned the ALABAMA after it sank and before the end of the war. However, in the Constitution of the Confederate States of America, adopted unanimously by the Confederate Congress on March 11, 1861, and modelled on the United States Constitution, there was a clause analogous to Article IV, Section 3, Clause 2 of the United States Constitution. It stated:
The Congress shall have power to dispose of and make all needful rules and regulations concerning the property of the Confederate States, including the lands thereof.
Confederate States of America Const., art. IV, § 3, cl. 2. Had the Confederacy won the Civil War, this clause presumably would have preserved its property interest in the ALABAMA and prevented the ship from becoming abandoned property. Thus, the Confederacy retained its property interest in the ALABAMA between the time it sank on June 19, 1864 and the time the war ended, on April 9, 1865 (Appomatox) or April 2, 1866. *See Freeborn v. The Ship Protector*, 79 U.S. (12 Wall.) 700, 702, 20 L.Ed. 463 (1872).

**13.** Because the United States did not officially abandon the ALABAMA, we need not address the contention that the ALABAMA and its bell are subject to the law of finds.

**14.** The Navy could compensate Steinmetz pursuant to 10 U.S.C.A. § 2572(b) (West Supp.1992), which allows the Secretary of the Navy to trade items held by the Navy for similar items held by an individual "which directly benefit the historical collection of the armed forces." Steinmetz's counsel has indicated that Steinmetz might agree to such a trade.

For the foregoing reasons we will affirm the judgment of the district court.